THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* S. W. STRAUS & Co., INC., and Others, Defendants.

Supreme Court, Kings County, September 13, 1933.

*McLaughlin & Stern* [*Martin Lippinan* and *Leo Stern* of counsel], for the petitioner.

*Nathaniel L. Goldstein*, for the receiver.

*Prentice, Collins & Dwight* [*Ezra P. Prentice* of counsel], for Rogers Peet & Co.

LOCKWOOD, J. Springsley Realty Corporation, now owner of the property known as No. 150 Broadway, New York, submits a plan of reorganization providing for a readjustment of the outstanding first mortgage bonds, a lien on said premises.

The court appointed Leon G. Godley referee to consider all the facts, to hear the bondholders and all others interested, to take proof and to report. The report is now before the court for consideration.

In the year 1923 the 150 Broadway Corporation erected a twenty-three-story store and office building on the northeast corner of Broadway and Liberty street, on a plot fronting 96 feet on Broadway, 135 feet on Liberty street. All of said plot was owned by the building corporation, except the corner lot 25 by 113 feet, which was leased from the Wendell estate by lease dated February 1, 1920, running for twenty-one years, with two twenty-one-year optional renewals — total term of lease, sixty-three years.

On February 27, 1923, the owning company made a first mortgage to secure a bond issue of $4,500,000, providing for interest at six per cent per annum, payable on April first and October first of each year, and calling for amortization or payments of principal to start at $112,500 on April 1, 1926, and to increase each year until April 1, 1939, when the balance of principal remaining would become due and payable.

These first mortgage bonds were sold to the general public through S. W. Straus & Co., Inc. All interest on the bonds outstanding has been paid each six months, and, in addition, $944,500 in bonds have been retired at par by the amortization payments, so that there are now outstanding first mortgage bonds of said issue amounting to $3,555,500, upon which interest at six per cent will next become due and payable October 1, 1933.

All taxes, assessments and water charges, ground rent and operating expenses to date have been paid.

The referee finds the income has been insufficient since May 1, 1932, to meet payments on account of principal to retire outstanding bonds at par, as provided in the mortgage.

The referee further finds that the owners, who have had years of

experience in the building and operation of properties, efficiently and economically manage the property and that all of the rents are being paid to the trustee as received.

The owner now states that under the conditions existing for the past few years the receipts from the property will not pay operating expenses, ground rent, taxes, assessments, water rates, interest at six per cent and provide for amortization or retirement of principal and for other necessary charges. It seeks a readjustment — a reduction in the interest rate and an extension of time of the maturity of the bonds beyond their present due date, April 1, 1939.

There appeared before the referee disinterested, experienced, expert managers of similar office properties who had examined the building and the books showing the income and expenses of the property for the past few years. The referee's report and the exhibits give full details on these matters.

For rental income this building depends largely on two important tenants.

The Westinghouse Company leases the eleventh to the twenty-third floors, inclusive, at a yearly rental of $347,660. The lease expires April 30, 1944. This company owns $307,000 of sub-ordinate mortgage bonds, which, under the terms of its lease, it deducts in installments from the rent each year, as follows: $26,000, plus interest from the 1933 rental; and $42,000, plus interest each year from 1934 to 1940.

Allowing for the deduction, the Westinghouse Company pays about three dollars and twenty-five cents per square foot for 107,500 square feet of floor space. This principal tenant recently moved most of its offices from No. 150 Broadway to the new Radio City office building uptown and is offering its vacant space in No. 150 Broadway, so far without success, at as low as one dollar and seventy-five cents a square foot. It is clear this condition makes it difficult, if not impossible, for the owners and managers of the the building to rent their vacant space at a higher price.

The other principal tenant, long engaged in the retail store business in New York, has a lease expiring January 31, 1941, of the main store, basement and some space on the second floor, at an annual rental of $170,000, or about seven dollars per square foot.

This tenant appeared before the referee through one of its vice-presidents, brought forward an expert and was represented by counsel. They offered testimony to the effect that it is impossible for it to continue to occupy the store and premises at the said rental of $170,000, and requested a reduction of $80,000 to $85,000 per year. They added that unless the rent is substantially reduced

it will be forced to close the store, which they claim is being conducted at a large loss each year; that it is now forced to do what many other merchants have had to do in these times — obtain rental readjustments in order to keep going.

Two of the oldest and most relied upon real estate firms testified that the fair rental value of this space to-day is: Cruikshank & Co., $90,000; Charles F. Noyes & Co., $100,000 per year.

It is common knowledge that many long-established and well-known firms, long considered financially impregnable, have, in the last few years, sought reduction in rent, and when unable to secure same have gone into equity receivership and, in some cases, into bankruptcy, and thus have been relieved by law of responsibility on unprofitable leases. The owners and the bondholders must now meet this problem and either reduce the rents to what is deemed a reasonable amount or take the chances of having the space vacant and of collecting future rental from this concern.

One-third of the total space in this building, other than that occupied by the two tenants, is now vacant.

It is thus apparent that the income for 1933 and subsequent years will necessarily be considerably less than the income has been during the years of good business.

The actual rents collected are reported as follows: Fiscal year — March 1, 1930, to February 28, 1931, $749,306; March 1, 1931, to February 29, 1932, $717,888; March 1, 1932, to February 28, 1933, $607,103; the estimated rents, without reduction to store tenant, March 1, 1933, to February 28, 1934, $570,000; estimated rent, same period, less full amount of reduction asked by tenant, $485,000.

From the rental each year must be deducted the ground rent to the Wendell estate, income tax on ground rent, city taxes, assessments, water rates, insurance, electricity, employees' salaries and other charges which, with but a nominal allowance for repairs and alterations, have averaged each year about $305,000.

The rental income keeps going down. There may be an increase in city taxes and water rates, also in cost of supplies and wages of employees when the building operates under the office building code provided for in the National Industrial Recovery Act. Income taxes on ground rent will increase as, and if, the government increases Federal income taxes.

Interest at six per cent on $3,555,500 of first mortgage bonds amounts to $213,330 per year. Add to this the fixed charges of $305,000 makes $518,300 required each year, without allowing for additional expenses and taxes hereinbefore pointed out and without

allowing any interest on the subsequent mortgages, which aggregate $1,654,000.

The managers report removals, readjustments and dispossesses since March 1, 1933, which affect income.

These facts and figures indicate " breakers ahead," and good business judgment requires that the request of the store tenant for the reduction be considered and decided promptly before taxes and mortgage interest go into arrears. A receivership should be avoided, if possible, as it invariably brings rental reductions, demands for concessions by old and new tenants and means a large expense. Delay may bring disaster, empty space and a loss of $170,000 a year in rental. The details of the basis of the application were made known to the referee and to the attorneys appearing for the respective parties. To publish them here might be a detriment to the tenant and to the property.

The general business depression, which affected all our people and all their properties, has likewise affected this building, and it seems that the sum remaining this year, after readjustment, will likely be insufficient to pay interest at the old rate of six per cent on the first mortgage bonds, and will probably provide nothing for the subsequent bonds.

The sole security of these bondholders is this property, and the only fund from which they can be paid either interest or principal is from the income.

The owners seek to deal direct with the bondholders, and this situation, where all taxes, interest and other charges to their last due date, other than amortization, have been paid, peculiarly lends itself to direct dealing between these two parties on a fair and equitable basis.

After reading all the testimony and the report of the referee, and hearing the attorneys, my understanding is the following plan will be submitted to the holders of the first mortgage bonds:

1. All rental, or other income from the building to be accounted for to the trustee, monthly.

2. The wages of employees, the bills for supplies, the ground rent and other payments under the Wendell lease, and the management charges to be promptly met.

3. The due date of the mortgage extended to April 1, 1948.

4. The interest rate on the first mortgage and bonds to be reduced to four per cent, payable semi-annually.

5. An amortization fund, if earned, of two per cent of the principal outstanding, to be set aside with the trustee, to provide for the purchase and retiring of outstanding bonds at par, by lot.

6. Seventy-five per cent of the remaining net income, if any,

to be used as follows: One-half to purchase outstanding first mortgage bonds in the open market, if they are procurable below par; the other one-half to be used to pay additional interest on the outstanding first mortgage bonds.

7. The remaining twenty-five per cent of said net income, if any, to be retained by the owners to enable them to meet charges on junior mortgage incumbrances.

The outstanding mortgages are reported as follows:

| | | |
|---|---|---|
| First mortgage bond issue................ | | $3,555,500 |
| Second mortgage bond issue: | | |
| Owned by Westinghouse Company and applied against rent under the terms of the lease........................... | $307,000 | |
| In hands of the Ley interests, who also own the Springsley Realty Corporation, owner of record........................... | 230,000 | |
| In hands of the public.................. | 17,000 | |
| | | 554,000 |
| Third mortgage held by a trust company as security for payment of rent under the Wendell lease. It bears no interest, and no payments are to be made, except in the event of a default in the Wendell rent........ | | 200,000 |
| Fourth mortgage, in hands of those friendly to the owner of the equity in the property..................... | | 900,000 |
| Total outstanding mortgage indebtedness.........| | $5,209,500 |

This plan, as proposed, provides that no expenses of reorganization can be charged to the first mortgage bondholders and none to the property until the first mortgage bondholders receive the proposed four per cent interest and the additional two per cent amortization, the latter being payable if earned. It does not disturb the tenants, and thus avoids further claim for adjustments of existing leases; it provides continuity of payment, as the first mortgage bondholders received their interest last April and would again receive it at the reduced rate, four per cent, on October 1, 1933.

The provision for four per cent interest and the two per cent amortization, if earned, seems reasonable. This building is now ten years old and depends largely for income upon the rental received from the Westinghouse Company under its lease of eleven floors. This lease expires April 30, 1944, and the other important lease expires 1941 (hereinbefore discussed). By that time the

building will be twenty years old, and not only in competition for tenants with the buildings erected in the last few years in the vicinity, but with the buildings which may be erected in the down-town section in the next ten years. No one can accurately foretell the conditions which will be prevailing in 1944, but it is reasonably safe to predict that an office building in New York, twenty years old, will be somewhat out of date and not a strong competitor with the up-to-date structures of 1944.

As the building gets older and the term of the Westinghouse lease shorter, it would seem to be good judgment to have the principal of the mortgage reduced each year.

Some have pointed out that it might not be advisable to renew the lease of the Wendell plot in 1941. It seems to this court that if the lease of this corner plot is not renewed the value of the remainder would be substantially damaged, for the taking away of the corner lot would cut off from the rest of the building the corner frontage on Broadway and on Liberty street, the most valuable part of the building would be lost and all of the bonded indebtedness would still be outstanding.

In any reorganization plan great care must be taken to see that any consent to the modification or extension of these first mortgage bonds be given upon the understanding and express condition that all of the present outstanding bonds shall be, and remain, upon a parity and equality and that the trust mortgage shall continue to be held for the equal and proportionate benefit and security of all of said present and future holders of said bonds and coupons, without preference, priority or distinction of any kind or nature whatsoever.

Inasmuch as there is always a danger of damage to the property, and, in turn, damage to the first mortgage bondholders by proceedings in behalf of the holders of subsequent mortgage issues, which might result in foreclosure or receivership, care should be taken to secure the consents to this reorganization plan of the holders of said junior securities.

It may be impossible to get the consent of each and every subordinate bondholder, but in each instance a substantial majority should be secured, and any action by the remainder protected against by an agreement of indemnity.

Furthermore, it is important to bondholders that interest payments be continued and paid on their due dates, as one of the great causes of suffering in the present crisis has been the stoppage of income to those dependent upon it for support.

The reduction in the interest rate from six per cent to four per

cent is not pleasing to investors, but it must be borne in mind that the long-continued world-wide depression has affected every business and every property and has uniformly resulted in either reduced income or a stoppage of income.

The savings banks of this State, large holders of bonds and mortgages and other securities, have reduced their interest rates by one-third, generally from four and one-half to three per cent. The business banks, which formerly paid as high as three per cent on balances, reduced the same to two per cent to one and one-half per cent, then to one per cent, and have finally been forbidden to pay interest on deposits subject to checks, by Federal regulation.

One of the results of conditions has been that prime investments in government and State bonds are selling on a yield of from four per cent down to below one per cent per annum.

For the past two years the conditions confronting owners of properties and owners of mortgages and mortgage bonds have received attention from the Federal and State governments and from the leading bankers and business men of the country.

In 1932 the Realty Stabilization Corporation, a non-profit, quasi-public corporation, announced through a statement issued by Hon. Owen D. Young, its chairman: " For some time past the major real estate interests of the Metropolitan area have been engaged in devising measures designed at once to strengthen and at the same time readjust the real estate situation in the city in the light of changed economic conditions. The latest steps to be taken involve co-operation between the real estate interests, banks, trust companies and the Reconstruction Finance Corporation."

This " step has been the recent effort to bring about co-operation between owners of real estate and the holders of mortgages to the end that interest on mortgages shall be adjusted to the productive power of the property and be promptly paid. The plan involved has an indispensable feature, co-operation by mortgage holders in reducing interest charges on outstanding mortgages. Effective co-operation * * * must presuppose prompt payment of taxes and interest by borrowers. Real estate values usually are the last to be adjusted in a cycle * * * the necessity for readjustment in the value of Greater New York real estate to the changed conditions has been recognized for some time. Real estate values depend upon income to be derived from the property, common sense teaches the unavoidable necessity for adjusting this equation. During the past two years, as is well known, many tenants otherwise willing have found themselves unable to pay their agreed rentals and have either abandoned their quarters or defaulted on

their leases. Thus, the return to owners from the properties themselves has shrunk considerably."

It is the purpose to " urge upon all mortgagees a prompt recognition of the principle that under present conditions they cannot expect more in interest upon their mortgages than the properties themselves will produce, and to adjust the interest rates on such mortgages."

Then came the national bank holiday, with every banking institution in the United States closed for some days.

About March 15, 1933, the Superintendents of Insurance and Banking of this State, by regulations, restricted the operations of the mortgage guarantee companies and thereafter limited the amounts they could pay in either principal or interest to holders of guaranteed mortgages or guaranteed mortgage certificates, to the amount they actually received in principal or interest, from the owners of the properties upon which said mortgages are a lien.

In the meantime, the New York Guaranteed Mortgage Protective Corporation, a quasi-public, non-profit body, was organized to protect the interests of holders of these guaranteed mortgages and mortgage certificates. To it were transferred the proposed reorganization plans of the companies, and on March 22, 1933, said corporation reported to the State Superintendents recommending rejection of all the plans.

In July and August, 1933, the Superintendent of Insurance applied to the Supreme Court and obtained orders of liquidation of some of the companies and orders of rehabilitation for most of the others, including the largest companies. These companies are taken into rehabilitation until it is determined whether their affairs can be so administered that all their creditors can be paid, or until it becomes evident that they cannot pay their claims in full and must be liquidated.

Thousands of holders of these guaranteed certificates are being requested to deposit their certificates with the New York Guaranteed Mortgage Protective Corporation for servicing at as low a cost as possible — said cost to be prorated among the mortgage or certificate holders.

As of December 31, 1932, the thirty-one reopened companies had total mortgage guaranties outstanding of over $126,000,000. The twenty mortgage companies to be rehabilitated had mortgage guaranties outstanding of nearly $3,000,000,000. For many months, efforts have been made on behalf of the mortgage companies to secure releases from their guaranties from the holders of their obligations.

The Federal government, pursuant to an act of Congress passed and approved by the President June 13, 1933, created the Home Owners' Loan Corporation, authorized to make first mortgage loans on houses containing not more than four families and valued at not more than $20,000, the loans not to exceed $14,000 and to be at four per cent interest. Where there are existing mortgages this government agency will only make the loan, providing the owners of the old mortgage will accept in exchange therefor bonds of the Federal corporation.

Recognizing that there were no buyers in the market for large parcels of real estate the Legislature of the State of New York, at the 1933 session, passed an act known as the Burchill Law,* permitting banking corporations as trustees of mortgages in foreclosure proceedings to purchase the same and relating to the operation, sale and reorganization of such properties by such trustees and regulating procedure to effect such reorganization and expense in connection therewith.

It provides, among other things, that such a plan of reorganization shall be binding on all the bondholders unless one-third of the holders in bonds in principal sum shall dissent therefrom within twenty days after it is promulgated.

As to holders of unguaranteed mortgage bonds, like those under consideration here, which are a lien on No. 150 Broadway, New York, a number of committees were formed for specific properties, but, realizing the large amount of such bonds in the hands of investors of small means, unfamiliar with the values or the management of real estate, a group of leading citizens of this city organized the Real Estate Bondholders' Committee, of which Hon. George E. Roosevelt is chairman. Under the guidance of eminent and experienced counsel this committee has taken steps to protect the rights of bondholders and has limited its expense for reorganization, including foreclosures, counsel fees and other necessary charges, to such an amount as may meet with the approval of the Hon. Samuel Seabury, who was selected to act as sole and final arbiter.

Where there are defaults in interest and taxes, or bad or extravagant management, the taking over of the property by such a reorganization committee is for the benefit and protection of the bondholders. However, it is recognized that the carrying through of a reorganization by this method is necessarily delayed by the conditions prevailing in the market, to wit, the lack of new mortgage money available which restricts the ability of the committee to borrow to pay taxes and expenses. Of course, under such a reorganization, where new money is borrowed, it is secured by a

* Laws of 1933, chap. 729.

first mortgage lien and the old first mortgage bondholders must take second mortgage.

In this instance, this bondholders' committee represents a substantial amount of bonds and was notified of the pending proceedings and through counsel attended the hearings and appeared before the court.

I am confident that after examination of the property, and of the proof, said committee and its counsel will recognize that here is a situation peculiarly adapted to direct and prompt negotiation and co-operation between owner and bondholder, and that it will lend its valuable support to the early adoption and carrying through of the plan as modified and approved by the learned referee in his report.

The referee here gave the matter most careful consideration and saw to it that all the bondholders of record were notified by letter of the pendency of the proceeding, and requested they send recommendations and suggestions direct to the referee. Many complied with this request and the court is informed that, almost without exception, bondholders showed a willingness to accept a reduction in the interest rate. This, to the mind of the court, proves that they want continuance of good management and a payment of interest, rather than a stoppage of payments and long delay and foreclosure proceedings and the cost and expenses attendant thereupon.

Among the important modifications made to the proposed plan by the learned referee is the one providing that if the building prospers a substantial part of the excess income will go to increase the interest payable to the first mortgage bondholders.

Interest is the largest item of expense of almost every mortgaged property. It is said that, at six per cent, it usually consumed between thirty per cent and forty per cent of the gross income of the property. It has been pointed out that foreclosures mean rent reductions, for, when a receiver steps in, tenants, with or without leases, demand, and usually receive, concessions and rent reduction, thus diminishing the income so that, frequently, the amount of rents on hand after paying the fixed charges is too little to pay the interest provided for in the mortgage.

It is here sought by co-operation between the owners of the mortgage bonds and the owners of the property to effect a reorganization without levying any assessment on bondholders and by providing for a continuation of the payments of income to them on their investments in the form of interest. Interest at a rate comparable with that paid by savings banks and by other corporations whose income has necessarily been reduced by the long-con-

tinued chaotic business conditions, which affected all, great or small, be he owner or investor.

Mr. Justice HAGGARTY of the Appellate Division of the Supreme Court, Second Department (dissenting), said in *People* v. *Straus & Co., Inc.* (236 App. Div. 796): " This court should be influenced in this action by the best interests of the bondholders only."

In considering reorganization plans affecting similar property the same court, in a unanimous opinion by Mr. Justice SCUDDER, in *Clinton Trust Co.* v. *142–144 Joralemon Street Corp.* (237 App. Div. 789), said: " The question before us now and to which we have given deliberate consideration is whether the court may and will act in such a situation. Over such reorganizations there resides in the court no direct power of approval or disapproval. But in the exercise of its equity jurisdiction the court may be alert to see that no injustice is done, not only to suitors, but to those somewhat remotely interested. * * * The way is not unblazed if it be thought that we are pioneering in a new field. In the Federal jurisdiction it has been comparatively common for courts to take cognizance of reorganization plans in foreclosure and other suits, and to withhold judgment or confirmation of a sale until some fair and open plan of reorganization was presented and substantially agreed upon; and it has been said: 'A court of equity's modes of relief are not fixed and rigid. It can mold its remedies to meet the conditions with which it has to deal.' "

In line with said decisions the court here feels that the plan proposed is so fair and equitable and contains so much merit that it should promptly be presented to the bondholders for their consideration and action.

To that end, the receiver is directed to co-operate with the applicant and to at once forward to the bondholders by mail, at the expense of the petitioner, the proposed plan and communication accompanying the same.

Order signed.